ALONZO WALBRIDGE

*v.*

FREDERICK S. DAY, AND ISAAC C. DAY.

1. HEIRS — *lands descend directly to them.* The title to the land of an intestate does not vest in his administrator as a trustee, but descends directly to the heirs.

2. ADMINISTRATOR — *extent of his control over the lands of the estate.* An administrator cannot affect the title of the heirs to their real estate, descended to them from the intestate, except by a sale authorized by an order of court. They hold the title in their own right, and only subject to the payment of the debts of their ancestor, in the mode prescribed by law, and not subject to any other control of the administrator.

3. ADMINISTRATOR'S *acts cannot affect the title of the heirs.* So, where an administrator accepted from a debtor of the estate a mortgage upon land of which the intestate died seized in fee simple, and the title to which had fully vested in the heirs by descent ; and a foreclosure and sale of the premises was had under such mortgage, it was *held*, that these proceedings on the part of the administrator, while they were an admission by him that the mortgagor had some title in the premises, in no wise affected the title of the heirs which they took by inheritance.

4. The administrator has no power to admit away the title to real estate which is held by heirs under the law of descents.

5. ADMINISTRATOR *may purchase the land from the heirs.* Nor would such proceedings on the part of the administrator operate to estop a subsequent administrator of the same estate from purchasing the title of the heirs to these premises, and holding it, at least against the right of purchasers derived under such mortgage.

6. TITLE OF HEIRS *not merged in any right acquired by administrator as such.* All the title which would pass by the foreclosure and sale in such case, would be the title which the mortgagor held in the premises. The title or estate held by the heirs by descent, would not become merged in that acquired by the administrator through the mortgage, so as to pass their estate by the sale on the decree of foreclosure.

7. FRAUD — *who has a remedy against it.* If in the sale and conveyance of land, the vendor perpetrates a fraud upon his grantee in respect to the title to the premises, the remedy against the fraudulent grantor will not inure to a subsequent purchaser from such grantee so as to enable him to recover from the fraudulent grantor the purchase money received by him.

8. CAVEAT EMPTOR — *judicial sales.* The rule of *caveat emptor* applies to a sheriff's sale of land under foreclosure of a mortgage by *scire facias.*

WRIT OF ERROR to the Circuit Court of the county of La Salle; the Hon. MADISON E. HOLLISTER, Judge, presiding.

In the year 1834, Edward Keys was the owner in fee simple of lot number eight, in block number fifteen, in the town of Peru, in La Salle county. Soon after, Keys died intestate, seized of the premises, leaving a widow and children. In 1837, George W. Howe became administrator of the estate, and in that capacity, on the 1st of September, 1837, he received from one Spaulding a mortgage upon these same premises, to secure the sum of $530. What title or claim Spaulding had to the lot, does not appear. Subsequently, Howe, the administrator of Keys, instituted proceedings by *scire facias,* to foreclose the mortgage, and in February, 1840, obtained a judgment of foreclosure, an execution was issued, by virtue of which the premises were sold on the 16th day of May following, to Jesse Williams, for the sum of $300. Williams assigned his certificate of purchase to Crosier, to whom the sheriff made a deed, on the 17th of May, 1842. Crosier afterwards conveyed the lot to Frederick S. Day and Isaac C. Day, the defendants in error; they conveyed to William F. Day, on the 2nd of November, 1846, this lot and another, for $1,500. On the 22nd of July, 1851, William F. Day re-conveyed the lot in question to the defendants in error, for the consideration of $600, by deed with special warranty. In November, 1851, Willis instituted an action of ejectment in the Circuit Court of La Salle county, against the Days, and recovered the premises.

Willis, the plaintiff in the action of ejectment, derived his title in the following manner: Keys, being the owner of the lot, died intestate, leaving his widow and several children;

afterwards one of the children died. In 1840, Howe, the administrator of Keys, died, and Walbridge, the plaintiff in error, who had married the widow of Keys, became administrator *de bonis non* of the estate, and after that, purchased from the surviving children and heirs at law of Keys, their interest in the lot; and thus all the title which the heirs of Keys held in the premises, became vested in Walbridge and his wife. On the 4th of May, 1850, Walbridge and wife conveyed to Willis, for the sum of $100. Under the title thus derived, Willis succeeded in the ejectment suit against the Days, who held under the sale on foreclosure of the mortgage, as already mentioned.

It appears, that at the May term, 1837, of the Circuit Court of La Salle county, Howe, as administrator of Keys, obtained an order for the sale of this lot to pay the debts of the estate, but there was nothing to show that a sale had ever been made under that order.

After Willis recovered the premises from the Days, to wit, on the 9th of July, 1852, he and his wife conveyed the premises to the Chicago and Rock Island Railroad Company, for the consideration of $1,600. And in the December following, the defendants in error, Frederick S. and Isaac C. Day, and their wives, conveyed the same premises, by quit-claim deed, to the railroad company, for the consideration expressed in the deed, of $100.

It seems, that prior to the institution of the action of ejectment, before mentioned, by Willis against the Days, the latter had compromised the question of title between them by paying to Willis the sum of eight hundred dollars; and by the sale subsequently made to the railroad company, the Days received one-half the purchase money for their interest in the lot.

Upon this state of facts, Frederick S. and Isaac C. Day, in September, 1855, exhibited their bill in chancery in the court below, against Walbridge, alleging that when he purchased from the heirs of Keys, and when he afterwards conveyed to Willis, he knew of the complainant's claim of title to the premises, and of the just and equitable grounds of the same,

and that it was unjust and unconscionable on the part of Walbridge to convey the lot to Willis, and thereby defeat the rights of the complainants.

It was further claimed in the bill, that inasmuch as the estate of Keys had received a full consideration for the lot upon the sale to Williams on the foreclosure of the mortgage mentioned, the entire title to the premises should have passed by that sale; and that the purchase by Walbridge from the heirs of Keys, and his sale to Willis, was a gross fraud upon the complainants. They therefore prayed, that Walbridge might be compelled to reimburse them in their losses by reason of their title being thus defeated, at least to the extent of the purchase money paid by Williams, with interest thereon, together with the taxes subsequently paid by them upon the lot. Upon the hearing, the Circuit Court decreed that Walbridge should pay the complainants the sum of $704.75, and costs, and awarded execution therefor.

Walbridge thereupon sued out this writ of error. The assignment of error presents the question as to the character of title acquired by Walbridge through his purchase from the heirs of Keys, and of Williams, who purchased under the foreclosure of the Spaulding mortgage; and also, whether the purchase by Walbridge and his subsequent sale to Willis, was a fraud upon the complainant.

Mr. E. S. Holbrook, for the plaintiff in error.

Messrs. G. S. Eldredge, and William Chumasero, for defendants in error.

Mr. Justice Walker delivered the opinion of the Court.

It appears from the evidence in this record, that Keys in his lifetime, was the owner of the lot in controversy. That upon his death, Howe became the administrator of his estate, and, as such, took a mortgage from Spaulding, upon this lot, to secure a debt payable to him as administrator, for the sum of five hundred and thirty dollars. That after its maturity

he foreclosed the mortgage by *scire facias*, and the property was sold to Williams, who afterwards assigned his certificate of purchase to Crosier, to whom the sheriff afterwards conveyed the lot. Defendants in error became the purchasers of Crosier some time in the year 1840. Howe departed this life, and plaintiff in error, who having previously intermarried with Keys' widow, became administrator *de bonis non* of Keys' estate.

He also purchased the lot of the heirs of Keys. He and his wife afterwards sold it to Willis, who instituted an action of ejectment against defendants in error, and recovered the property. Afterwards, Willis and defendants in error sold the property to the railroad company for sixteen hundred dollars. On these facts the court below decreed that plaintiff in error pay to defendants in error the sum of $704.75 and costs of the suit, and awarded execution to enforce its payment.

There is no pretense that plaintiff in error was either directly or remotely connected with title derived from Spaulding, by the foreclosure of his mortgage to Howe, the administrator of the estate of Keys. But it is supposed that the court below acted upon the supposition that plaintiff in error, as administrator *de bonis non*, was estopped from acquiring title to the premises, and that, by doing so, he perpetrated a fraud upon defendants in error, which renders him liable to make compensation to them. Even if this was true of the title of which the intestate was the owner, it could not apply to an outstanding title, which has been sold in the collection of a debt. When Howe, as administrator of the estate, took the mortgage, he certainly admitted that Spaulding had some kind of title to the premises. But he had no power to admit away the title held by Keys' heirs. Nor could the foreclosure of the mortgage, or the sale of the property under execution, have that effect. When this sale was made, it was not proposed to sell the title of the heirs, but it was Spaulding's title. That sale could by no conceivable rule of law merge their title, legally or equitably, into Spaulding's. It was a sheriff's sale, and the rule of *caveat emptor* applies.

The administrator could not affect the title of the heirs to

their real estate, descended to them from the intestate, except by a sale authorized and licensed by an order of court. They hold their title in their own right, and only subject to the payment of the debts of their ancestor, in the mode prescribed by the law, and not subject to any other control of the administrator.

We are at a loss to perceive how the administrator *de bonis non* can be estopped from purchasing a title from the heirs of his intestate, by the former administrator having foreclosed a mortgage and procuring the premises to be sold to pay a debt. His predecessor made no warranty of the title, and if he had, it would have been personal, and could not affect his successor. Nor does it appear that Howe made any misrepresentations as to the character of the title sold by the sheriff; but, had he done so, it could only have harmed him individually, and would not have operated against his successor. The title of the intestate does not vest in the administrator as a trustee, but it descends directly to the heirs.

It is not pretended that plaintiff in error did any fraudulent act to mislead defendants in error, when they purchased at the sheriff's sale. Nor does the record contain any evidence that Howe ever sold the premises for the payment of debts of the estate. It only appears that Howe was authorized to make such a sale by a decree of court. Under such a state of facts, we can perceive nothing to prevent the heirs from selling, or plaintiff in error from purchasing, their title. Defendants in error have not shown that they had any interest in Keys' title to this lot. They only show their connection with Spaulding's title. So far as defendants in error are concerned, they are wholly disconnected with, and are strangers to, the title held by Keys' heirs.

But even if Howe was guilty of any fraud, it was upon Williams, the purchaser at the sheriff's sale. But, if that were established, we are at a loss to perceive how the right to recover the purchase money received by Walbridge could inure to the benefit of defendants in error. When they purchased, it was for them to satisfy themselves of the validity of the title, and require covenants of the grantor, or to risk

the title under a quit-claim deed.   If their grantor perpetrated a fraud upon them, their remedy is against him.   Or, if they took a covenant in the conveyance, they must look to it for their right of recovery.

The decree of the court below is reversed, and the cause is remanded.

*Decree reversed.*